**YASUDA FIRE & MARINE INSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**LAKE SHORE ELECTRIC CORP., and Westinghouse Electric Corp., Defendants.**

No. IP89–847–C.

United States District Court, S.D. Indiana, Indianapolis Division.

July 31, 1990.

John M. Choplin, III, Norris Choplin & Johnson, Indianapolis, Ind., for plaintiff.

Richard E. Aikman, Jr., William N. Ivers, Stewart & Irwin, Indianapolis, Ind., for defendant Lake Shore Elec. Corp.

James R. Fisher, Ice Miller Donadio & Ryan, Indianapolis, Ind., for defendant Westinghouse Elec. Corp.

## ORDER ON MOTIONS TO DISMISS

McKINNEY, District Judge.

This products liability action comes before the Court on the motions to dismiss filed by defendants Lake Shore Electric and Westinghouse Electric. The issues raised have been briefed and are ready for

resolution. For the reasons set forth below, the Court DENIES the motion.

## I. *Factual and Procedural Background* [1]

Plaintiff Yasuda Fire & Marine Insurance filed this subrogation action in August of 1989, seeking to recover sums paid to its insured for property damage caused by the malfunction of an electrical device at a chicken farm. In its Amended Complaint, Yasuda charges that a "Trans-O-Matic" switch designed, manufactured, and sold by Lake Shore Electric, which contained "components" made by Westinghouse, malfunctioned and caused a loss of power to ventilation fans in a poultry house. Numerous chickens suffocated causing property damage to the insured.

Yasuda paid more than $70,000 to the insured for these losses, and in this action now seeks to recover from the defendants for selling "the switch and components in a defective condition unreasonably dangerous to Yasuda's insured...." Yasuda grounds its diversity action solely under the Indiana products liability statute.

Both defendants have moved to dismiss the action, raising three different arguments. First, defendants assert that Yasuda cannot recover because it lacks privity with them. Second, they argue that Yasuda is not a "user or consumer" under the Act. Finally, defendants contend that Yasuda has failed to allege the requisite personal injury or sudden property damage necessary for recovery under the Act. As is discussed below, none of these arguments carries the day at this juncture.

## II. *Discussion*

### A. Privity

Defendants argue that there is no privity between them and Yasuda. Relying on *Citizens Gas & Coke Utility v. American Economy Insurance Co.*, 486 N.E.2d 998 (Ind.1985), they assert that without such privity, Yasuda cannot recover against them in this pure property damage claim.

It takes little analysis, however, to demonstrate that this argument is without merit. The Products Liability Act clearly and unambiguously dispenses with the privity requirement in *Ind.Code* § 33-1-1.5-3(b)(2), which provides that liability for defective products exists even though "the user or consumer has not bought the product from or entered into any contractual relation with the seller." This section obviously removes privity from the relevant inquiry in a products case.

Indeed, the Indiana Court of Appeals confirmed just last year that this provision of the Act means what it says. Specifically, in *General Electric Co. v. Drake*, 535 N.E.2d 156, 159 (Ind.App.1989), the court held that "I.C. 33-1-1.5-3(b)(2) obviates the need to show privity." The *Drake* court added that this section "does not admit of any other interpretation." *Id.* at 159.

Moreover, the *Drake* panel made clear that the *Citizens Gas* decision upon which defendants rely in this case is inapplicable to products actions brought under the current version of the Act. The *Drake* court's discussion is better quoted at length than paraphrased, and reads as follows:

> We acknowledge that in *Citizens Gas* as here the sole issue ... was ... privity of contract.... There, however, resolution of the issue depended upon the common law and not the Product Liability Act because [the plaintiff] alleged, not a defective water heater, but the negligent installation of an otherwise sound water heater. The court in *Citizens Gas* therefore had no reason to consider the applicability of the Product Liability Act and did not do so.

> We need not concern ourselves here with the applicability of *Citizens Gas* to a claim of negligence in the design, manufacture or sale of a defective product.... We note however that the *Citizens Gas* court reasoned, at least in part, from a line of cases involving defective products which ultimately evolved into

1. For purposes of this Rule 12(b)(6) motion to dismiss, the Court accepts the well-pleaded allegations of the plaintiff's complaint as true. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99,

101-102, 2 L.Ed.2d 80 (1957); *Cain v. Larson*, 879 F.2d 1424, 1425 (7th Cir.1989); *Rankow v. First Chicago Corp.*, 870 F.2d 356 (7th Cir.1989).

Indiana's common law doctrine of strict product liability. While at one point in time, we might have been persuaded that the *Citizens Gas* rule extended to actions premised upon a strict liability theory, in 1983 the legislature made significant changes to the 1978 Product Liability Act, constricting the applicability of common law negligence rules. First, the General Assembly limited the coverage of the Act to actions in which the theory of liability was strict liability in tort, removing negligence and its concomitant interpretive case law from the purview of the Act. Second, the legislature deleted that portion of ... the Act which provided that the Act was a codification and restatement of the common law.

*Drake,* 535 N.E.2d at 158. (citations omitted).

Thus, lack of privity is no defense in an action such as this that is brought under the Products Liability Act.[2]

### B. User or Consumer—"Bystanders" and The Effect of Subrogation:

■ Defendants next argue that Yasuda is not a "user or consumer" under the Act. In response, Yasuda asserts it is a "bystander" that is covered by the Act. As discussed below, defendants' argument fails, but primarily for reasons other than that advanced by Yasuda. The most important point is that, Yasuda, as the subrogee of the owner of the chicken farm that sustained the damage, is entitled to bring this action because it is subrogated to the rights of the actual user or consumer who would otherwise have the right to sue under the Act.

#### 1. *The statutory requirement that plaintiff be a user or consumer:*

This analysis begins with the language of the statute itself. The Act imposes strict liability on anyone

who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any *user or consumer* or to his property ... if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject as being subject to the harm caused by the defective condition....

*Ind.Code* § 33–1–1.5–3(a) (emphasis added). In the definitional section of the Act, the term "user or consumer" is defined as

a purchaser, any individual who uses or consumers the product, or any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question, or any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.

*Ind.Code* § 33–1–1.5–2.

Thus, in summarizing these two provisions, and without more, in order to recover under the Act the plaintiff must be:

(a) either a user, a consumer, an individual in possession and control of the product and acting on behalf of the injured party, or a bystander injured by the product who would reasonably be expected to be in the vicinity of the product; and

(b) in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defect.

Based on this, it is seen that the defendants raise a legitimate issue as to whether Yasuda can recover under the Act. This is so because Yasuda, which provided insurance for the user/consumer, was not a user or consumer itself, nor was it in possession or control of the product.

However, although not raised by the parties, the Court cannot ignore the common law of subrogation under which Yasuda filed this action in the first place. As dis-

---

**2.** Moreover, although the Court does not reach the issue, it would seem that privity would actually be present in this case. This is so because Yasuda is subrogated to the rights of the insured. The insured was presumably in privity with the defendants, and because Yasuda stands in the shoes of the insured in this subrogation action, Yasuda would also seem to be in privity with them.

cussed below, this doctrine allows Yasuda to stand in the shoes of the actual user or consumer and bring an action under the Act.

### 2. The effect of subrogation:

■ The doctrine of subrogation has been well established as a part of Indiana's common law for many years. The Indiana Supreme Court wrote in 1952 that "an insurer, who has paid a loss agreeable with its insurance contract, may be subrogated either by contract or by equity to the rights of the insured for the amount so paid, against the tort-feasor who caused the loss...." *Powers v. Ellis*, 231 Ind. 273, 108 N.E.2d 132, 135 (1952).

Indiana appellate courts have reaffirmed the existence and propriety of subrogation on many subsequent occasions. *See, e.g., Cook v. American States Ins. Co.*, 150 Ind.App. 88, 275 N.E.2d 832, 840 (1971) ("insurance companies have a legal right to write subrogation agreements in their policies"); *Mutual Hospital Ins., Inc. v. MacGregor*, 174 Ind.App. 550, 368 N.E.2d 1376, 1379 (1977) ("Indiana courts recognize that insurance companies have a legal right to write subrogation agreements in their policies"). *See also* A. Windt, *Insurance Claims and Disputes* § 10.05 (1988) (discussing subrogation and noting that insurers are ordinarily entitled to subrogation on making a payment to or on behalf of the insured); 6A J. Appleman, *Insurance Law and Practice* § 4051 (1986) (same).

Under this well-entrenched doctrine, "When the insurer is claiming a right through subrogation it stands in the shoes of the insured...." *Hockelberg v. Farm Bureau Ins. Co.*, 407 N.E.2d 1160, 1162 (Ind.App.1980). In short, subrogation is the "lawful substitution of a third party in place of a party having a claim against another party." *Black's Law Dictionary* 1279 (5th ed. 1979).

In light of this concept, one would expect that Yasuda, as the subrogee of the actual user of the product in question, should be entitled to stand in the shoes of the user and pursue any legal remedies, including a products liability action, that the user might have. Indeed, it seems surprising that the parties have not even raised this issue. It is possible that so much attention has been focused upon the "user or consumer" language of the Act that the realm of subrogation law has been overlooked.

The defendants could make the argument (and do so implicitly by not raising the issue) that the legislature, by using the specific words "user or consumer" in the Act, precluded subrogees from bringing products actions. Defendants would no doubt point out that there apparently is no post-Act authority addressing the relevance of subrogation to products actions.[3]

---

3. Here it must be noted that *State Farm Fire & Cas. Co. v. Structo Div., King Seeley Thermos Co.*, 540 N.E.2d 597 (Ind.1989) (vacating 530 N.E.2d 116 (Ind.App.1988)), is of little or no relevance to this case because of the ambiguity surrounding its holding. In *State Farm*, a fire resulted from a defective gas grill and caused damage to an apartment. The owners and tenants of the apartment were insured by State Farm, who paid off on the policy and sued the gas grill manufacturer under the Product Liability Act.

According to the Court of Appeals' decision, the trial judge ruled for the manufacturer "determining that State Farm's *insureds*, during the time in which the action accrued, were neither users nor consumers...." *State Farm*, 530 N.E.2d at 117 (emphasis added). However, even though this statement would lead one to conclude that the lessor's or tenant's status as a user or consumer was at issue, the Court of Appeals then framed the issue in the appeal as follows: "The sole issue presented in this appeal

is whether ... [the 1978 Act] encompasses only users and consumers as the act expressly defines them, thereby excluding *State Farm* from those who may maintain a cause of action in products liability." *Id.* (emphasis added). The Court of Appeals then determined, without specifically discussing State Farm or making any mention of subrogation, that "bystanders" were not included in the 1978 Act.

The Indiana Supreme Court later reversed the Court of Appeals on the grounds that bystanders were included in the 1978 Act. *State Farm*, 540 N.E.2d 597. However, in so doing the Indiana Supreme Court gave short shrift to the issue, and it is not clear from the two-page opinion whether it is lessors that can be considered bystanders or whether it is lessors' *insurers* that are somehow treated as bystanders. Unfortunately, the opinion, though well reasoned on the general bystander issue, is otherwise "terse." M. Rosiello, M. Klein, *Survey of Products Liability Law*, 23 Ind.L.Rev. 617, 622 (1990). More-

However, where a common law doctrine is firmly established, the courts are not to lightly cast it aside. Indeed, as the Indiana Supreme Court made clear long ago, it will not be presumed that the legislature intended to make changes in the common law beyond what is specifically altered in express writing or by unmistakable implication. *Chicago & E.R. Co. v. Luddington,* 175 Ind. 35, 93 N.E. 273, 273–74 (1910). *Accord, Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 109 S.Ct. 1981, 1991, 104 L.Ed.2d 557 (1989) (party contending that legislature changed settled law has burden of showing such change was intended); *Long Beach Township v. City of New York,* 445 F.Supp. 1203, 1215 (D.C.N.J. 1978) (statutes are not to be construed in derogation of common law unless such an intent is clear); *Williams v. American Broadcasting Cos.,* 96 F.R.D. 658, 665 (W.D.Ark.1983) (statute will not be construed to overrule a principle of the common law unless it is clear such a change was intended).

In this setting, there is no basis to believe that the legislature intended to nullify the remedy of subrogation as to insurance carriers who insure persons or businesses who might suffer losses from defective products. To the contrary, all indications are that subrogation remains alive and well in products cases. This is shown by several different factors.

First, in a subrogation action brought prior to the adoption of the Act, the Seventh Circuit affirmed a judgment entered by Judge Noland of this Court in a products liability claim. *See Reliance Ins. Co. v. Al E. & C., Ltd.,* 539 F.2d 1101 (7th Cir.1976). Although the Seventh Circuit's opinion never specifically addressed the issue of whether a subrogee could bring a products action, the parties to the action, as well as both the District Court and Seventh Circuit, implicitly believed that a subrogee could maintain such a lawsuit.

Even though *Reliance Insurance* is a pre-Act case, it is helpful here because the Products Liability Act, as originally enacted, was a codification of common law. *See Ind. Code* § 33–1–1.5–3 (1978 version) ("The common law of this state with respect to strict liability in tort is codified and restated as follows...."). The original version of the Act used much the same "user or consumer" language as today's version. Thus, there is no reason to believe that the present version of the Act alters the pre-existing common law for products actions under which a subrogee could stand in the shoes of the user or consumer it insured. *See also Lantis v. Astec Industries,* 648 F.2d 1118 (7th Cir.1981) (implicitly recognizing that a personal representative of a decedent killed by a defective product can bring a products action, even though the representative was not the actual user).

Second, where a statute is open to two interpretations, it must be construed to avoid illogical and absurd results. *Hatcher v. Lake Superior Court,* 500 N.E.2d 737, 739 (Ind.1986); *In Re Marriage of Lopp,* 268 Ind. 690, 378 N.E.2d 414, 422 (1978). In this setting, the products Act can arguably be interpreted expansively (and thus "narrowly" in effect) to hold that "user or consumer" means the actual user or consumer and not someone who succeeds to the legal rights of the user or consumer, such as a subrogee or personal representative. However, such an interpretation must be avoided because it would, in fact, lead to illogical and absurd results.

Precluding such "representative" actions would alter both the common law of subrogation and the statutory law of wrongful death. Moreover, insurers would suddenly be in the untenable situation of having to honor insurance policies without having the opportunity to recover from sellers who caused the damage. It would be odd for the legislature to carve out products liability as an area from which subrogation

over, in light of the fact that neither the Court of Appeals nor the Supreme Court gave a clear and consistent framing of the issue (the Court of Appeals' "framing" of the issue is inconsistent with the issue which, according to the Court of

Appeals, was decided by the trial court; the Supreme Court never stated who the "bystander" at issue was in the case), it cannot be said with any confidence that the *State Farm* case has any real bearing on today's issues.

should be excluded, particularly when the Act itself is remedial in nature.

Additionally, such a statute, at least if applied retroactively, could arguably have constitutional ramifications. *See, e.g., Greyhound Food Management, Inc. v. City of Dayton,* 653 F.Supp. 1207, 1211 (S.D.Ohio 1986) (district court finds unconstitutional a statute that retroactively barred subrogation claims against municipalities), *aff'd on other grounds and remanded,* 852 F.2d 866 (6th Cir.1988). This Court determines that such an interpretation is improper in this setting.

A third factor is that there is no indication that there is any trend toward abrogating the right of subrogation in products cases. If a number of other jurisdictions had language similar to Indiana's Act, and if the courts had subsequently determined that only the actual user or consumer has standing to bring the action such that the common law of subrogation should be abrogated in products actions, then there might be an argument that Indiana intended such a result and that Indiana was merely doing what other states have done.

However, the case law from other jurisdictions indicates that subrogees ordinarily have the right to bring product liability actions. Indeed, as in the Seventh Circuit's *Reliance Insurance* subrogation products action, the cases typically have no specific discussion of the subrogee's status other than to briefly mention it in the initial factual background section, thus implicitly approving of the action. *See, e.g., Strzelecki v. Blaser's Lakeside Industries, Inc.,* 133 Mich.App. 191, 348 N.W.2d 311 (1984) (subrogee as plaintiff in products action; no discussion of issue); *Fruehauf Corp. v. Trustees of First United Methodist Church,* 387 So.2d 106, 108 (Miss.1980) (same); *Potsdam Welding and Machine Co. v. Neptune Microfloc, Inc.,* 57 A.D.2d 993, 394 N.Y.S.2d 744, 745 (1977) (same); *Shelby Mutual Ins. v. Circuit Court,* 67 Wis.2d 469, 228 N.W.2d 161 (1975) (same).

Moreover, although at least one state has restricted the right of subrogation in the products setting, the specificity with which that legislature did this further supports the conclusion that the right of subrogation has not been abrogated in Indiana. *See Rodia v. Tesco Corp.,* 11 Conn.App. 391, 527 A.2d 721, 722 (1987) (statute in question there provided that "neither an employer nor ... the insurer of such employer, shall have any lien upon any judgment received in any product liability claim, or any right of subrogation if the claim against the third party is a product liability claim."). *See also Greyhound Food Management, Inc. v. City of Dayton,* 653 F.Supp. 1207, 1211 (S.D.Ohio 1986) (example of type of language used to preclude subrogation from an area of the law; Ohio statute regarding municipal liability specifically provided that "[n]o insurer ... is entitled to bring an action under a subrogation provision ... against a political subdivision...."), *aff'd on other grounds and remanded,* 852 F.2d 866 (6th Cir.1988).

In conclusion, the doctrine of subrogation is well entrenched in Indiana, and without a clear expression to the contrary from the legislature, this common law doctrine remains applicable to actions brought under the Product Liability Act.

### 3. *The Bystander Issue:*

An additional issue that has been raised but need not be resolved at this point is whether Yasuda could be a foreseeable "bystander" under the Act. The theory here is that, as an insurer for the user, Yasuda's agents would periodically be in the vicinity of the product, and that as a result the seller should reasonably expect them to be in the product's vicinity. In this context it must be remembered that the Act defines a "user or consumer" as including "any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use." *Ind.Code* § 33–1–1.5–2.

Although it seems highly unlikely that Yasuda would be able to establish this element given the probable infrequency with which such an insurer's agents would be on the premises, the Court must nonetheless note the somewhat curious plausability of the argument. Indeed, the Indiana Court

of Appeals has indicated that this foreseeability issue is "typical of the kind of question left for jury resolution," *Drake*, 535 N.E.2d at 160. The *Drake* court accordingly approved of the denial of a seller's summary judgment motion where lessors claimed that they were "bystanders" under the Act whom the seller should reasonably expect to be in the product's vicinity. *Id.* at 159–161. *See also, Survey of Recent Developments in Indiana Product Liability Law*, 23 Ind.L.Rev. at 620 (noting that in light of *Drake*, "as a practical matter, the foreseeability test would appear to make the bystander issue a jury question in virtually every case").

Although this Court notes that a lessor of a residence would likely be on the premises and thus in the vicinity of the product with more frequency and regularity than an insurer of a chicken farm, this Court, if it were to reach the issue today, could not make factual assumptions about such matters at this juncture. Here it is essential to remember that this is a Rule 12(b)(6) motion, and that this Court's duty would be to ask whether it appears beyond doubt that plaintiff cannot muster any facts to prove that the seller should expect Yasuda's agents to be in the product's vicinity. *Papapetropoulous v. Milwaukee Transport Services*, 795 F.2d 591, 594 (7th Cir.1986)

(setting forth this general standard for 12(b)(6) motions).

Though weak and possibly still a candidate for disposition at a later date, Yasuda's theory would probably survive the 12(b)(6) stage. However, as is discussed in the following footnote, there are subtle legal issues of Indiana law affecting the bystander question that this District Court should avoid reaching now, particularly where Yasuda gets its day in court under the subrogation theory. *Accord, Centerre Bank v. New Holland Div. of Sperry Corp.*, 832 F.2d 1415, 1420 (7th Cir.1987) (Seventh Circuit declined to "unnecessarily" resolve a difficult State law issue where "more direct ground for decision" was available). Thus, this Court expresses no binding opinion on whether Yasuda is a bystander under the Act.[4]

**C. Physical Harm:**

■ The final issue is whether Yasuda has alleged the requisite type of damage under the Act. According to Lake Shore Electric, the action must be dismissed because Yasuda seeks "[m]ere economic loss." (Br. of Lake Shore Elec. at 4). Although there is authority for this proposition, *see Dutton v. Int'l. Harvester Co.*, 504 N.E.2d 313, 318 (Ind.App.1987) (Judge Conover writes that "personal injury other than mere economic loss must be proved"),

---

**4.** A crucial issue in this context that has not been addressed by the parties is whether a bystander must show that it would foreseeably be exposed to personal injury, or whether the foreseeability of property damage is enough. Despite the fact that the *Drake* court made a special effort to state that there should be no distinction between injury to property or persons under the Act, *Drake*, 535 N.E.2d at 159 ("injury to property is so akin to personal injury that there is no logical reason for distinguishing between them"), the *Drake* opinion and the definitional section of the Act can also be read as requiring bystanders to be reasonably foreseeable victims of personal injury.

This is shown by the court's statement that the issue was whether "the [plaintiffs] as … lessors could reasonably be expected to be within the vicinity of the product…." *Id.* at 160. According to a recent article on the subject, "This would appear to require that the lessor be exposed to *personal* injury in order to be compensated for injury to property." *See Survey of Products Liability Law*, 23 Ind.L.Rev. at 620

(emphasis in original). However, the article adds that the "rationale for such a requirement is not entirely clear." *Id.*

This Court need not reach this issue at this stage because it has not been developed by the parties, and because, in light of the subrogation issue discussed above, it appears that the issue will not need to be addressed in this case. The Court notes, however, that the statute states that the bystander must be someone "injured by the product who would reasonably be expected to be in the vicinity of the product during its expected use." *Ind.Code* § 33–1–1.5–2. There is possible ambiguity in this, for a bystander may be "injured" if his property is subject to sudden and major damage, but it is very possible that although his property (i.e., a landlord's home) might foreseeably be in the vicinity of the product, the bystander himself might not regularly be in the vicinity. There are legitimate arguments on both sides of this issue, and this is certainly an area ripe for clarification from the legislature.

this District Court, duty bound to predict how the Indiana Supreme Court would rule, cannot agree with this proposition in light of the language of the statute to the contrary.[5]

The starting point must again be the language itself. The Act provides that one who puts a defective and unreasonably dangerous product into the stream of commerce "is subject to liability for *physical harm* caused by that product to the user or consumer *or to his property....*" *Ind. Code* § 33–1–1.5–3(a) (emphasis added). The Act then defines "physical harm" as "bodily injury, death, loss of services, and rights arising from such injuries, *as well as sudden, major damage to property.*" *Ind. Code* § 33–1–1.5–2 (emphasis added). The next sentence of the statute then excludes "gradually evolving damage to property or economic losses from such damage." *Id.*

Thus, it is seen that the liability section of the Act expressly allows recovery for "physical harm" to "property." As the Indiana Court of Appeals recently made clear, "Physical injury to property is so akin to personal injury that there is no logical reason for distinguishing between them." *Drake,* 535 N.E.2d at 159. The statute unequivocally mandates, by use of the disjunctive "or," that a cause of action lies for physical harm "to the user or consumer *or* to his property." *Ind. Code* § 33–1–1.5–3 (emphasis added).

Under the plain language of this subsection, then, the physical harm to the property need not be accompanied by personal injury. The statement to the contrary in *Dutton,* which relied on this very subsection, *see Dutton,* 504 N.E.2d at 318, simply cannot stand in the face of the subsection's

unambiguous language. As the Indiana Court of Appeals stated in *Drake,* "We conclude, then, that the legislature did *not* intend to impose as a condition of standing, that a bystander sustain bodily injury." *Drake,* 535 N.E.2d at 160 (emphasis added).

■ Still, there is an alternative reading of the definitional section of the Act that, although not relied upon by the *Dutton* court, could arguably support the conclusion that economic loss alone is not enough. Looking again to the definition of "physical harm," it is seen that this term means

bodily injury, death, loss of services, and rights arising from any such injuries, *as well as sudden, major damage to property. This does not include gradually evolving damage to property or economic losses from such damage.*

*Ind. Code* § 33–1–1.5–2 (emphasis added). The problem in this case is not that plaintiffs have failed to allege "sudden major damage to property," for a fair reading of their complaint supports the inference, at the 12(b)(6) stage, that suffocation of chickens is "sudden" and "major damage" to property. Moreover, unlike in *Dutton,* there is no dispute that these chickens were "property."

The potential ambiguity comes from the legislature's statement that physical harm "does not include gradually evolving damage to property or economic loss from *such damage.*" The problem is in locating what is meant by "such damage." There are two distinct possibilities here, as follows: (1) this could incorporate the "major damage to property" referred to in the first sentence of the definition of physical harm, or (2) it could refer to the "gradually evolving damage to property" which immediate-

---

**5.** It is appropriate to note that this District Court's duty, while sitting in diversity, is to attempt to predict how the Indiana Supreme Court would rule on these State law issues. *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern Nat. Ins.,* 750 F.2d 619, 624 (7th Cir.1984); *Heinhold v. Bishop Motor Exp., Inc.,* 660 F.Supp. 382, 385 (N.D.Ind.1987). In so doing, this Court must keep in mind that "its function is not to choose the rule that it would adopt for itself, if free to do so, but to choose the rule that it believes the state['s] [high] court,

from all that is known about its methods, is likely to adopt in the future." *Payton v. Benson,* 717 F.Supp. 1346, 1349 (S.D.Ind.1989) (per Judge Tinder). Although "proper regard" must be given to rulings of the intermediate appellate courts, *Id.,* the ultimate goal is to simulate the State's high court. Thus, where it is readily apparent that an intermediate appellate decision would not be followed by the Indiana Supreme Court, this diversity Court should not give much if any weight to such a decision. *Williams,* 750 F.2d at 624.

ly precedes the "economic loss from such damage" language.

In light of this ambiguity, it is appropriate to look again to the statutory rules of construction. One of the well established canons of construction, known as the Rule of the Last Antecedent, holds that qualifying words or phrases must be applied to the words or phrase immediately preceding them and are not to be construed as applying to others more remote. *See, e.g., Wilshire Westwood Assoc. v. Atlantic Richfield Corp.,* 881 F.2d 801, 804 (9th Cir. 1989); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751 (1st Cir.1985); *Alvarado v. J.C. Penney Co.,* 713 F.Supp. 1389, 1391 (D.Kan.1989).

This Rule is applicable in this case, and leads to the conclusion that the term "such damage" refers to the "gradually evolving damage to property" that immediately precedes the term "such damage." Indeed, there is Indiana authority holding that when the descriptive and relative word "such" is used in a statute, it refers to the last antecedent unless the meaning of the sentence would be impaired. *Op.Ind.Atty. Gen.* 250 (1950).

This conclusion is bolstered by examining several other factors. First, a law review commentator who frequently writes on products liability has implicitly recognized that it is economic losses from gradually evolving damage that are not recoverable, rather than economic losses from sudden and major property damage. In discussing the 1983 amendments, and, in particular, the definition of "physical harm" at issue in this case, this commentator wrote:

> The new definition's requirement that property damage be sudden and major *and that no economic loss may be recovered from gradually evolving damage* could cause some unexpected problems if taken literally. What may be

'sudden' and 'major' to one person may not be to another. For example, 'major' damage may mean a $50 bent fender to a poor man but not to a rich man. This section may be directed to specific cases such as the 'spalling brick' cases. If so, it would be specific legislation to limit the liability of specific parties in specific cases. As such, the courts should closely scrutinize this section.

J. Vargo, *Products Liability,* 17 Ind.L.Rev. 255, 275 (1984) (emphasis added).

This passage is important here not for the author's discussion of what "sudden" and "major," might mean, but instead for the statement that "no economic loss may be recovered from gradually evolving damage." The author, who studied the statute and based much of his article on interviews with the primary sponsors of the legislation, thus construed the statute in a manner consistent with the Rule of Last Antecedent.

Second, it is appropriate to consider the effect of a contrary interpretation. If the statute were construed to read that physical harm did not include economic losses from sudden, major damage to property, it would seem that there would be few cases in which any recovery could actually be had for "sudden, major damage to property." This is so because if "economic losses" were not recoverable for such property damage, it is unclear what losses would be available.

That is to say, as in today's case, the main (if not the only) loss incurred due to the property damage is *economic* in nature. The liability and definitional sections of the Act make it clear that recovery shall be had for sudden and major damage to property, but this recovery would, for all practical purposes, be negated if economic losses were not included.[6]

---

**6.** Other than the *Dutton* case, this is not inconsistent with the few opinions that have addressed the meaning of "economic losses," a term that is, unfortunately, left undefined in the statute. For instance, in the pre-amendments case of *Sanco, Inc. v. Ford Motor Co.,* 579 F.Supp. 893, 898 (S.D.Ind.1984), *aff'd,* 771 F.2d 1081 (7th Cir.1985), Judge Dillin held that when damage is sudden and calamitous, recovery may

be had in tort, but when damage results merely from deterioration, internal breakage, and the like, it will be considered "economic loss, as to which recovery may be had only on a contract theory." *See also Mac's Eggs, Inc. v. Rite–Way Agri Distributors, Inc.,* 656 F.Supp. 720, 730 (N.D.Ind.1986).

Thus, in this Court's view, the Indiana Supreme Court would follow the language of the statute and hold that recovery for all losses, including those that are economic in nature, are recoverable for sudden and major damage to property. Because Yasuda's Amended Complaint can be read as alleging such sudden and major property damage, the motion to dismiss must be denied.

IT IS SO ORDERED.

Thus, as suggested in *Sanco*, the term "economic loss" seems to refer not to a particular type of damage, but rather to *particular situations* in which damage results from an event that is better suited to contract than tort remedies. Where the particular event in question is something "non-tortious" such as gradual internal breakage, and where the resultant damage is, not surprisingly, often limited to the product itself, *see* Annot., *Strict Products Liability: Recovery for Damage to Product Alone,* 72 A.L.R. 4th 12 (1989), it comports with reason to allow only a contract or Uniform Commercial Code recovery.

In this State, however, the legislature has provided a strict liability tort remedy for "sudden, major damage to property." The questions of whether such a remedy is duplicative of contract or U.C.C. remedies, and whether such an avenue of redress through the tort system is wise, are now academic in Indiana. Absent a contrary signal from the legislature, the statutory language must be followed.